This case also involves migraines, and they are thoroughly documented. Which is one reason why I reacted to the other case the way I did, where I thought it was really not documented. It certainly stands in contrast to this case. In this case, the sole reason given by the ALJ for rejecting the migraines is a severe impairment. A bifold reason, but it's kind of one reason. He cited to evidence prior to the election on September 8th You know what's happening. You're turning your head and that's fine, but the mic isn't following you as you do it. So you come across... Sorry about that. I'll raise it up and hopefully that will cure the problem. First point I was going to make is that the record that the ALJ cites in rejecting the degree of impairment predates the alleged onset date of disability. Bakewell doesn't even allege she was disabled at the time of the evidence that the ALJ relies upon for rejecting her testimony. The second reason the ALJ gave for rejecting the migraines, and I think this is the core issue in this entire case, he thought they were well controlled on medications. Now, the record thoroughly describes the migraines post alleged onset of disability. She's having days long migraines accompanied by vomiting, severe photophobia, and she's essentially having to stay locked up in her room for two to three days at a time, approximately twice a month. She said it was about five days. What was the exact evidence that she had to miss five days of work each month because of the migraines? Was that her testimony alone or anybody else's? Well, the doctors noted that she was still having migraines about twice. These are all flowing together. I have four cases today. So do we. Yes, I'm beginning to appreciate the difficulty with that. I believe there was a doctor in here cited by the district court that said that they were occurring about twice a month, which I argue is consistent with her testimony that they were occurring twice a month. Well, all I can find in the record, and please point out if I missed something, which is quite possible under all of these cases, all I could find was her testimony that she had to miss work five days a month. Well, there's certainly evidence in the record documenting that the migraines do continue to occur. Oh, I will make one point about the migraines. They stopped occurring about a year and a half before the end of the period that we're talking about here. She finally got them controlled. But there's evidence all throughout the record that the migraines do occur, and she's treating them with the prescribed medications she was on. I can't remember. I see a report from 2003 that says she has a PMG doctor's clinic, says she has a migraine no more than twice a month, takes Zomeg with good effect. I believe that's the record. Then it says in 2004 she complains of migraine headaches. It's been a problem for several years. Tend to be alleviated with Zomeg, but sometimes not. Then there's another report in 2005, has migraine headaches once or twice a month. Imitrex usually works, but sometimes does not. She can have a headache for three to four days with nausea, vomiting, and photosensitivity. That's what I see. Yeah, and the last report of the migraines that I found in the record is February of 2005. This one's March, actually. Okay. Maybe it was March, maybe. But after that, by June of 2005, she had the migraines under control. So on the basis of the migraines alone, there is a short period right at the end of the period at issue. She was found disabled at the age of 55. Well, my question really was verifying that she had to miss five days a week. A month. A month, excuse me, because of the migraines. And the only testimony or the only record of that was not from doctors who said, you know, two to three a month, but her own testimony that she would have to miss work five days a month. Well, as Judge Berzon just cataloged, there does appear to be evidence in the medical records of approximately this frequency. All right. But whether that's true or not, my understanding of your point is what isn't true is what the ALJ said. In other words, he — It's not true. Right. He might have been able to conclude that it wasn't five days a month, it was three days a month or something like that. But even three days is the same. He said it was nothing, essentially. He just didn't use the migraines at all. Zero. Yeah. Totally controlled. What do you want us to do? Do you want us to remit — Pay the case. Huh? Pay the case. I believe, Your Honor, that the court should take judicial notice of that missing. And it doesn't matter if it's three days a month or five days a month. It's pretty hard for a court on appeal if it's doing its function. I don't think so. Perhaps you will find a determination. And what I think we have to do is remand for reevaluation, assuming we'd agree with you. I would not be upset if that happened. I consider any reversal a win in this court. But I do believe that under the Varney 2 case, that when the claimant's testimony has been improperly rejected, it is appropriate for the court to remand for an award of benefits by crediting that testimony. The point, at least, question I have is let's assume we say she doesn't have migraines five days a week, but there's some evidence that she's got three days a week. So now we decide she's disabled. So doesn't somebody, and usually it's the ALJ, have to compare that with everything else that's in the record and then make a determination? Well, typically, in order to determine whether a particular severity of impairment, here we're talking about missed hours of work, is disabling, you ask a vocational expert. The ALJ asks a vocational expert. And typically, any vocational expert in his or her right mind will say that missing two or more days a month is, in fact, disabling. And there's not, as far as I'm aware, a Ninth Circuit-published case directly on point holding that specific thing. But there are certainly district court decisions across the country that cite that type of evidence and then go on to apply the two to three days a month rule and find that, in fact, it is a disabling level of impairment. I'd like to reserve the rest, if I may. Thank you very much. Good morning, Your Honors. I'm Catherine Miller on behalf of the Commissioner of Social Security. The ALJ in this case properly sorted out the facts in the law, and the district court found the decision was supported by an abundance of evidence and legally sufficient reasons. And I would first like to address Judge Nelson's concern about evidence supporting migraine headaches. Pull that mic closer to you. Oh, I'm sorry. Five days. I also have a hearing impairment, so I understand this. Incapacitating the client. I don't, but I still need to hear what you're saying. Right. All right. Five days a month, the only evidence in the record is the claimant's testimony. That's the only evidence. And even though the ALJ only cited to one exhibit, I'm talking about being incapacitated for five days a month. But there is a fair amount of medical evidence that says that she is continuing to have migraines, and he says it's totally under control. He says it's effectively controlled with medication. And I don't have the exact site, but Ms. Bakewell has had migraines since she was a teenager, and it did look like she went through an exacerbation of this problem when she was having some sort of hormonal issues. But she has consistently taken abortive medications for this condition. This is a theme throughout the medical record. And the Zomig did work for her. Sometimes. Sometimes. Now, we don't have any evidence she was incapacitated for five days. It looks like ---- That's fine. And there's a difference between whether it's exactly what she says or whether it's at least a problem that should have been dealt with by the ALJ and not dealt with and not construed as nonexistent, which is what he said. I don't think that's what the ALJ did. If you look at the ---- What does effectively controlled mean? It would mean to me that it isn't in any way affecting her ability to work. Well, I would direct this Court's attention to the hearing transcript. And there the ALJ asked Ms. Bakewell, he says, okay, you're saying Imitrex doesn't work for you. Has a doctor prescribed prophylactic medications? No. So no prophylactic medications have been prescribed. So what we can infer from that is her migraines can be controlled using abortive medications. Now, obviously, abortive medications work after the fact. But she continues to get refills of Imitrex. And Mr. Wilborn made a statement that at some point her headaches were effectively controlled as of June 2005. Well, November 2005, she goes to the hearing and says they're not being effectively controlled. What does effective mean? Abortive medications after the fact. She continues to get refills of this medication. And another thing I'd like to point out is that the claimant, you know, the heart of her disability claim is CTS or carpal tunnel syndrome, tenosynovitis and leg issues. And in fact, in her disability report, which she filed with her application, she never mentions headaches at all. It's only at the hearing that we find out that they're allegedly disabling. And the ALJ cites to her initial disability report in her application at ERA 35. I have another question. A great deal of the ALJ's determination with regard to her other issues was based on his understanding of the report by Ms. Frank. Yes. And I don't understand how he read that the way he did. I mean, for example, he said that the conclusion was that she didn't have an elbow problem. He says that Ms. Frank showed no elbow difficulty. I think Ms. Frank says that she demonstrated an increase in elbow pain when she was asked to do certain extensions and after seven repetitions, the pain increased. She teared up and demonstrated a tight pitch. At another point, she stopped because she said she couldn't do it. And Ms. Frank doesn't suggest that these were phonies. So how does he get the conclusion that Ms. Frank said there was no elbow problem? Well, I think that, and I can't recall precisely, but Ms. Frank submitted an overall capacity assessment at the very front of the 18-page capacity examination. And I don't believe that there's any elbow limitations there. So even though there may have been, you know, slight findings in the 18-page capacity assessment, her overall conclusion didn't indicate that she required a 10-pound lifting limitation. Rather, she tested her elbow strength and found that she could lift up to 14 pounds frequently and 20 pounds occasionally. So I think that although there's a lot in that report, and it's a very thorough report, Ms. Frank did submit her final conclusions at the beginning of that. I had one more question, which may be a little out of line, but it's weird. The final conclusion about what she could do, everybody agreed that she couldn't do keyboarding, right? Right. And the final conclusion was that there were three jobs she could do. Now, I don't know who is making these determinations about what involves keyboarding, but as far as I know, all three of those jobs in the modern world would obviously involve keyboarding. I've never seen a receptionist who doesn't have a computer that they have to work with. I don't know an appointments person who doesn't have a computer they have to work with. And I think the third one was something about a dispatcher, and he has to have a computer. So I don't know what they're talking about. Well, I guess the person who made that conclusion was a vocational expert. I know they were, but I don't know what vocational world they're working in. Well, I – obviously the vocational expert does have expertise in this area. Well, I think she's working out of a very old source book, essentially. I don't know. I don't know enough about the job of dispatcher, frankly, to say that it involves keyboarding off the top of my head. I would defer to the vocational expert's opinion in this case, and I would just note that there was no – I don't know if there were doctors or anybody else in the last 10 years who doesn't use a computer. Now, the fact of the matter is, is that she was – well, that's true. I would have to concede that. Nevertheless, we don't have a challenge to the reliability of the vocational expert testimony, and I believe under Ninth Circuit case law under Bayless, the V.E. testimony is presumptively reliable. I have another question about Dr. Sternenberg. Yes. In your brief, you suggest we should reject his findings, is that his responses are inconsistent with his medical records. Well, I looked at them. I can't find any evidence to indicate that his findings are inconsistent with his records. I think really the point is, is that his findings are internally inconsistent, and if I argued in a way that was less clear, that is the point. And the ALJ spoke to that at the hearing because, on the one hand, Dr. Sternenberg, I believe in September 2008, says Ms. Bakewell can't stand or walk at all. Zero. Well, they note that his lifting restriction is inconsistent with his own notes, indicating that Blakewell's elbow function was well restored. However, those notes predate medical records indicating that her elbow condition was no better or became worse. The second piece of evidence, that contemporaneous physical therapy notes indicate a full passive range of motion, does not prove that Dr. Sternenberg's findings were inconsistent. This question provides, well, let me just say, how would you respond to that? Well, the way I would respond to that is that upon reading the paragraph where the ALJ is talking about Dr. Sternenberg's findings with regard to lifting and then talks about well restored elbow function, it's actually unclear what piece of evidence the ALJ is referring to when he says well restored. At the beginning of that paragraph, the physical therapy notes are from January 2003, one month before Dr. Sternenberg's assessment. And those do show full range of motion, decreased pain, and the claimant was doing better. But I think rather than focusing on that, it's more important to look at the conflicting medical evidence, which shows the ALJ provided specific and legitimate reasons supported by substantial evidence under Oren. That would be Dr. Solomon's consultative examination showing complete, completely intact upper extremity exam, as well as the occupational therapist's very extensive testing showing that the claimant is capable of lifting up to 14 pounds frequently. The ALJ ever deal with Dr. Roberts? Well, the ALJ did cite to Dr. Roberts. But he never discussed it? He did not explicitly say I reject Dr. Roberts' repetitive hand use. And his determination was essentially the same as Dr. Sternenberg's? Well, actually, I would say it was broader because, in fact, Dr. Sternenberg found the claimant was capable of frequent handling and simple grasping and fine manipulation, where Dr. Roberts, who saw the claimant once, said, oh, she can't engage in repetitive hand use. But then he also said no keyboarding. Then he also said she had no limitations on standing or walking. So what I think is important here is this Court has not required ALJs to use magic words in rejecting doctor opinions. If this Court can draw inferences from the ALJ's summary of the evidence and his treatment of the conflicting medical evidence in here, he thoroughly reviewed Dr. Sternenberg's reports, the occupational therapist, and Dr. Solomon's reports. So I would say the bottom line is really this. The ALJ discredited much of what Ms. Bakewell said about herself because he thought the doctors, or at least some of the doctors, were saying that she was malingering essentially. The Ms. Frank's report and Dr. Solomon's report were essentially accusing her of exaggerating her symptoms. Is that accurate? I don't think that's entirely accurate. I actually read this decision as being somewhat sympathetic to the claimant. Unfortunately, the evidence isn't there supporting disability. But on what basis did he not credit her very specific report, for example, with regard to the migraines, that she was at times, relatively frequent times, had to go to her room and close the door for several days and have her 5-year-old grandson go to the neighbor's for dinner and so on? Why did he say that he didn't believe that? Well, I think two reasons. He said her activities were inconsistent with her chronicle of limitations. I think the ALJ found it was. Why were they? Well, because she was. I cook dinner when I can, but when I have a migraine, I go into a room for three days. Well, I think the ALJ expressed some disbelief that she could be the sole guardian of a very, very young child and be incapacitated for five days and not get out of bed for three days. It's a sad story, but she was apparently left with this grandchild, and she did the best she could. But the ALJ gave another reason. The ALJ said that it appears that Ms. Bakewell somewhat exaggerated her symptom testimony. Right. And he said that's why I'm going back to the fact that he seemed to be basing that. Well, let me just clarify that, though, based on the observations of the occupational therapist. And those observations came from the validity criteria. Now, the ALJ. Which she said were. Showed poor effort. I'm sorry, what? Showed poor effort on testimony. Because she, but she specifically said that she did not attribute that to exaggeration, but to pain and fear of pain. But he decided to attribute it to an exaggeration. Well, he said somewhat exaggerated. In other words, on her view, it corroborated her pain, and on his view, it undermined it. I think that it's, I really don't see sort of a negative intent from the ALJ's reasoning. He says somewhat exaggerated. He doesn't say malingering. And, in fact, he specifically says Dr. Solomon found no symptom magnification. Okay. All right. Thank you very much. Ms. Gerrelborn, briefly. The one thing I would like to call to the Court's attention is that the ALJ found she was limited to less than sedentary. Dr. Sternberg said she can't engage in stooping. No stooping. Sedentary plus no stooping equals disability. And that is Social Security ruling. Why is that, by the way? Why do sedentary people have to stoop? Pull things out of filing cabinets? I don't know. Sedentary. I mean, it's a funny rule to me. That's what it says, though. So, anyhow, if you look at page 7 of my reply, I discuss this, and the point I make there is that nowhere does the ALJ give any reason for rejecting this stooping opinion. The only thing that he talks about is that her elbow function appeared to be well restored. So on the basis of this unrejected testimony, coupled with the ALJ's own finding that she's limited to sedentary, I submit that this case can be remanded for an award of benefits. As Judge Ferris seems to be interested in whether or not this Court can remand cases for an award or not. I'm not suggesting we can't. We don't acknowledge many limitations on our powers, even though the Supreme Court may sometimes disagree. Okay, thank you very much, Hansel. The case of Bacol versus Astro is submitted, and we go to Rushing versus Astro. Oh, yes, we are going to take a break.
judges: Farris, Nelson D. W., Berzon